UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                          Case No. 1:23-cr-20676

v.                                           Honorable Thomas L. Ludington
                                           United States District Judge

JEFFREY BARTLETT, et al.,

                Defendants.

_____/

**OPINION AND ORDER (1) DENYING DEFENDANTS' MOTION TO STRIKE AND PRECLUDE DBE ALLEGATIONS; (2) DENYING DEFENDANTS' MOTION TO DISMISS MULTIPLICITOUS COUNTS; (3) DENYING DEFENDANTS' MOTION TO DISMISS UNDER THE RULE OF LENITY; AND (4) GRANTING DEFENDANTS' MOTION TO DISMISS COUNT IV AS TIME-BARRED**

Defendants Jeffrey Bartlett, Brian Bartlett, Anthony Thelen, Adam Ball, and Andrew Semenchuk are charged with wire fraud, conspiring to commit wire fraud, and conspiring to defraud the United States. Trial will begin on September 15, 2025. But the Parties have filed many pretrial motions that must be resolved first. This Opinion & Order resolves four.

First, this Court will deny Defendants' Motion to Strike and Preclude the Government's allegations that they engaged in a scheme to falsely certify their commonly controlled company, Surveying Solutions Inc., as a Disadvantaged Business Entity. Such allegations are relevant and material to the Government's wire fraud theory and, contrary to Defendants' claim, this theory is "valid" under binding Supreme Court and Sixth Circuit precedent.

Second, this Court will deny Defendants' Motion to Dismiss either of the conspiracy charges in Counts I and II. As explained below, the conspiracy charges arise from separate statutes with different elements and are thus not impermissibly multiplicitous and do not place Defendants in double jeopardy.

Third, this Court will deny Defendants' Motion to Dismiss the operative indictment under the "rule of lenity." Defendants argue that the phrase "common control" is ambiguous and undefined in the Federal Acquisition Regulation. But such regulation does not impose any criminal sanction and does not implement any criminal statute, let alone the criminal statutes that Defendants allegedly violated. So the rule does not apply.

Fourth and finally, this Court will grant Defendants' Motion to Dismiss Count IV as barred by the applicable five-year statute of limitations.

## I.

### A. Factual Background

Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, Brian Bartlett, and Anthony Thelen are charged with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I); conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and thirteen counts of wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XV). ECF No. 132. All charges stem from Defendants' alleged conduct involving Surveying Solutions Inc. (SSI), Michigan's "premier" construction and surveying consulting firm. *See About*, SSI, https://ssi-mi.com/about/ (last accessed May 13, 2025) [https://perma.cc/T2TW-EQVV]. The Government generally alleges Defendants equally controlled and used SSI and affiliated shell companies to defraud the United States of millions of dollars through federally funded transportation contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *See id.* at PageID.1508 (alleging "80-90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration).

Defendants' alleged offense conduct is best considered in three parts. First, the Government alleges that, on the front end, Defendants conspired to fraudulently obtain and maintain SSI's

certification as a Disadvantaged Business Enterprise (DBE) to obtain preferential status when bidding on transportation contracts with MDOT. *See id.* at PageID.1513–16. Second, once awarded a contract—regardless of whether the contract was awarded because of Defendants' front-end DBE scheme—Defendants knowingly misrepresented SSI's overhead and labor costs to artificially inflate MDOT's reimbursement. *Id.* at PageID.1516–22. Third, the Government alleges that, on the back end, Defendants equalized all ill-gotten gains at the end of each fiscal year for each Defendant's personal benefit. *Id.* Each part of Defendants' alleged conduct will be discussed in turn.

### 1. Defendant's Alleged DBE Scheme

Start with Defendants' alleged DBE scheme. Congress enacted the United States Department of Transportation (USDOT) Disadvantaged Business Enterprise (DBE) Program in 1983 to "assist small business formation and growth." *See Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Feb. 10, 2025), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise.[1] The DBE Program achieves this objective in part by certifying certain businesses as DBEs, based on three qualifying criteria.

First, a DBE must be "small," as defined by the Small Business Administration, 49 C.F.R. § 26.65(a). Second, a DBE must be "at least" 51% owned by a socially or economically

---

[1] Prior USDOT administrations emphasized another rationale for the DBE Program. The Biden Administration, for example, emphasized that the DBE Program was created to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide." *See Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (noting the DBE Program "level[ed] playing field by providing small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts") [https://perma.cc/LAA6-WW9U].

disadvantaged individual. *Id.* § 26.69(a); *see also id.* § 26.5. "[W]omen, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, [and] Subcontinent Asian Americans" are presumed to be socially and economically disadvantaged. *Id.* § 26.67(a)(1). And any individual is presumably economically disadvantaged if their personal net worth is less than $2,047,000. 49 C.F.R. § 26.68(a). Third, the DBE applicant must be sufficiently independent from other entities. 49 C.F.R. § 26.71(g). The applicant "must prove that it would be viable as a going concern" without existing arrangements or relationships with other companies, and the applicant "must not regularly use another firm's business-critical vehicles, equipment, machinery, or facilities to provide a product or service under contract[.]" *Id.*

Certification is crucial because "only bona fide small firms," owned and controlled by socially and economically disadvantaged individuals, may participate in the DBE Program. *See Disadvantaged Business Enterprise (DBE) Program*, U.S. Dᴇᴘ'ᴛ ᴏғ Tʀᴀɴsᴘ., https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (last updated Feb. 10, 2025). And certifying state agencies "must deny [DBE] applications based on sham transactions or false representations, and . . . must decertify DBEs that engage in or make them." 49 C.F.R. § 26.69(g)(2). Importantly, DBEs may receive more contract opportunities once certified because the DBE Program requires state transportation agencies—like MDOT—to increase DBE participation and competition in the transportation contracting industry. *See* 49 C.F.R. § 26.39 (suggesting five permissible strategies).

SSI was a certified DBE before 2011, when SSI was owned by non-party Guy Spreeman. *See* ECF No. 37 at PageID.102; Opinion Letter from Sheryl G. Williams, Acting Associate Director, External Civil Rights Programs Division, U.S. Dept. of Transp., to Franklin Adams, Manager, Business and Administrative Services Division, Mich. Dep't of Transp. (July 2

7, 2015), https://www.transportation.gov/sites/dot.gov/files/14-0071-Surveying%20Solutions%2C%20Inc..pdf [https://perma.cc/SU3Z-VUBV] [hereinafter USDOT Letter]. But Spreeman passed away in January 2011, and majority ownership of SSI "passed by default" to Defendant Jeffrey Bartlett. *Id.* Because Defendant Jeffrey Bartlett was a "non-disadvantaged individual," "MDOT removed SSI's DBE certification in July 2011." *Id.*

On February 25, 2011—just after Defendant Jeffrey Bartlett acquired control of SSI—the Government alleges that all Defendants entered into a written "Secret Agreement" that provided that all Defendants would be equal owners of the "SSI Group"—a group of companies including (1) SSI, (2) 2SI Development, LLC (2SI), (3) 3SI Building and Leasing, LLC (3SI); (4) Geo Precision Services, LLC (Geo); and (5) Southfield IT.[2] *See* ECF No. 132 at PageID.1511, 1514, 1520. This Secret Agreement read as follows:

> It is the intent of this agreement that the Buyers and Sellers will each own a *20 percent undivided interest in the above named companies* at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock, Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have *equal ownership of the companies* at the completion of the "Buy In" period.

*Id.* at PageID.1514 (emphasis added); *see also* ECF No. 113-2 at PageID.1189 (sealed) ("No matter who on paper owns majority of any company, the intent is for everyone to have equal shares in every company[.]"). Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen signed this agreement as the "Sellers," while Defendants Adam Ball and Andrew Semenchuk signed as the "Buyers." ECF No. 132 at PageID.1515

---

[2] Southfield IT was not listed in the 2011 Secret Agreement because it was not created until late 2014 or early 2015. *See infra* Section I.A.2.a.iii. But Defendants included Southfield IT in the SSI Group and ensured that, consistent with all other SSI Group entities included in the 2011 Secret Agreement, each Defendant received an equal 20% share of Southfield IT's profits at the end of each fiscal year. *See* ECF No. 113-1 at PageID.983 (sealed).

On June 2, 2011, shortly after signing the alleged 2011 Secret Agreement, Defendant Semenchuk—an Asian Pacific Islander and the purported sole owner of Geo—applied to certify Geo as a DBE. *See id.* at PageID.1511, 1513. Geo became DBE certified soon after. *See* USDOT Letter, pg. 2. One year later, in June 2012, Geo purchased 51% of SSI and became its majority owner. *Id.*; *see also* ECF No. 37 at PageID.106–07. In October 2012, "MDOT revoked Geo's DBE status because, after purchasing control of SSI, "Geo was no longer [an] independent business." USDOT Letter, pg. 2. Defendant Semenchuk then dissolved Geo, transferred Geo's assets to SSI, and operated "solely under SSI's name[] because [SSI] had better name recognition and a more established credit history." *Id.* So, by December 2012, Semenchuk—rather than Geo as an entity— was SSI's purported majority owner. *Id.* But the Government cites Defendants' 2011 Secret Agreement and alleges that Semenchuk, in reality, only owned a 20% share of SSI equal to all other Defendants, and "never had ultimate managerial control[.]" ECF No. 132 at PageID.1514.

On April 19, 2013, Semenchuk applied to certify SSI as a DBE. ECF No. 132 at PageID.1524. But MDOT denied the application in December 2013 for three main reasons. USDOT Letter, pg. 2–3. First, MDOT concluded that SSI was insufficiently independent because it (1) leased two of its three offices from 3SI, and (2) leased surveying equipment and cars from 2SI when 2SI was partially owned by SSI executives Defendants Brian Bartlett and Anthony Thelen. *See id.* When pressed for more information, Semenchuk told MDOT officials—contrary to the 2011 Secret Agreement—that "neither he nor any owners of SSI possessed *any* ownership interest in" 2SI or 3SI, and that all were "totally separate and distinct entities." *Id.* (emphasis added). But when MDOT requested tax returns or outside lease agreements to corroborate these claims, Semenchuk refused to comply. *Id.* Second, MDOT "concluded that SSI could not prove by clear and convincing evidence that the transfer of ownership [to Semenchuk] occurred for reasons

other than obtaining DBE certification[.]" *Id.*, pg. 5. Third, MDOT concluded that Defendant Semenchuk had not proven he controlled SSI. *Id.* at pg. 5–6. Indeed, MDOT noted that SSI may have actually been controlled by Defendant Jeffrey Bartlett, an experienced surveyor who owned SSI just before Semenchuk and Geo's purchase, and owned 48% of SSI after this purchase.[3] *See id.*, pg. 6.

But, on July 27, 2015, the USDOT reversed MDOT's decision and directed MDOT to certify SSI as a DBE "without delay[.]" *Id.*, pg. 7; ECF No. 132 at PageID.1516. The USDOT found "nothing in the record"[4] to suggest Defendant Brian Bartlett's and Anthony Thelen's dual status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. USDOT Letter, pg. 4. Although "70% of SSI's business account payments (excluding personnel costs) were paid to [2SI and 3SI], the evidence in the record indicate[d] that the transactions between SSI and 2SI/3SI were arms-length transactions." *Id.* USDOT disagreed with MDOT's conclusion that Defendant Semenchuk purchased SSI solely to obtain SSI's DBE certification because, "in [his] words, he purchased SSI because he 'wanted to expand [Geo], eliminate competition, and . . . make

---

[3] In response to MDOT's inquiries about SSI's relationship to 2SI and 3SI, Defendant Semenchuk emailed all other Defendants "it was just a matter of time." ECF No. 113-3 at PageID.1361 (sealed). Defendant Brian Bartlett replied "Boys. I'm drinking and not because of good things. FUCK." *Id.* at PageID.1362 (emphasis in original). Defendant Ball replied, "as long as the leases are within reasonable fair market value, it will be interesting to see what they can truly call unfair." *Id.* at PageID.1363. Defendant Jeffrey Bartlett replied "Well, no secrets any more [sic]." *Id.* at PageID.1364. Defendant Semenchuk then replied and suggested two "options" Defendants could take to avoid MDOT scrutiny, one of which was to withdraw SSI's DBE application since this "would not be considered a denial" and Defendants could "re-apply" after they "correct the wage structure and add another layer by making 2 new llc's and have 2si and 3si still as 100% members of the new llc." *Id.* at PageID.1368. Indeed, Defendant Semenchuk suggested Defendants could "hire somebody to be a 'fake' member" of the new LLC "once filed" so MDOT would "never know who owns what[.]" *Id.*

[4] The "record" the USDOT reviewed in 2015 is not the same as the evidentiary record currently before the Court. Indeed, it is unclear whether USDOT's administrative investigation considered the evidence uncovered throughout the Government's criminal investigation in 2019, including Defendants' alleged 2011 Secret Agreement.

a profit.'" *Id.*, pg. 6. Although Defendant Jeffrey Bartlett owned 48% of SSI and was an experienced surveyor, the USDOT found no evidence that he had "the power or authority to control" SSI after Defendant Semenchuk's purchase. *Id.*

On August 28, 2014, before SSI was certified as a DBE but seemingly in celebration of forthcoming certification, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Adam Ball, Andrew Semenchuk, and Anthony Thelen the following email:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

ECF No. 132 at PageID.1516 (emphasis in original).

After SSI was DBE certified, Defendant Semenchuk submitted annual "No Change Affidavits" to MDOT to maintain its certification in July of 2016, 2017, and 2018. *Id.* at PageID.1515. Through these affidavits, Semenchuk repeatedly affirmed that he—a "socially disadvantaged" individual—was still SSI's majority owner. *See* 49 C.F.R. § 26.83(j). The Government alleges these representations were fraudulent because, per the 2011 Secret Agreement, Semenchuk was not SSI's majority owner and, like all other Defendants, only owned a 20% share of SSI. ECF No. 132 at PageID.1515.

At bottom, the Government characterizes Defendants' alleged DBE scheme as one of the "manner and means" to effectuate their alleged conspiracy to commit wire fraud (Count I) and as an "object" of their conspiracy to defraud the United States (Count II). *See* ECF No. 132 at PageID.1523.

### 2.  Defendants' Alleged Overbilling Scheme

But regardless of SSI's status as a DBE, at the core of these conspiracies lies Defendants' alleged overbilling scheme. The Government alleges that, after SSI received a contract, Defendants artificially created and inflated costs subject to MDOT reimbursement. *See id.* at PageID.1516–

22. Before discussing Defendant's alleged overbilling in detail, it is necessary to explain how MDOT paid SSI on each awarded contract.

Consistent with applicable regulations, MDOT paid SSI by multiplying SSI's "direct labor costs" by an "indirect overhead rate," and then applying a fixed 11% incentive fee, intended to provide SSI with a profit. *See id.* at PageID.1509–10. SSI's "direct labor costs" were calculated on a contract-by-contract basis by considering the number of SSI employees who worked on a contract, the number of hours each employee worked, and each employee's hourly rate. *See* ECF No. 132 at PageID.1509. SSI's "indirect overhead rate," on the other hand, was calculated through an annual "pre-qualification process" that considered SSI's expenses during the prior fiscal year. *See id.*

Generally, a contractor may include property rental expenses in its purported overhead rate, subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critical to the first type of Defendants' alleged misrepresentations discussed below, if the contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*, such as "depreciation, taxes . . . and maintenance" for the specific piece of rented property[5]. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF No. 132 at PageID.1518.

Ultimately, to pay and reimburse SSI for awarded contracts, MDOT wired funds from its Comerica Bank account in Michigan to SSI's Huntington National Bank account in Ohio. ECF No. 132 at PageID.1522. And the Government has identified 13 wire transfers from MDOT to SSI

---

[5] But if the commonly controlled entity "has an established practice of leasing the same or similar property to unaffiliated" third parties, the contractor's rental costs "shall be allowed" as if the leasing entity was not commonly controlled. *See* 48 C.F.R. § 31.205–36(b)(3).

throughout 2018 and 2019. *See id.* at PageID.1525–27. Accordingly, as alleged, Defendants' overbilling is *both* an object of their alleged conspiracies (Counts I and II) *and* forms the factual basis for thirteen separate counts of wire fraud (Counts III—XV). *See id.* at PageID.1512–13, 1525–27.

Against that backdrop, the Government alleges that Defendants defrauded MDOT through two separate schemes flush with fraudulent misrepresentations and omissions. *See* ECF No. 132 at PageID.1523. The first concerned SSI's relationship to other companies. *Id.* The second concerned SSI's relationship to its own employees. *Id.*

### a.  Costs Attributable to Commonly Controlled Companies

First, the Government alleges that, despite Defendants' 2011 Secret Agreement and other evidence indicative of common control, Defendants told MDOT that the SSI Group companies—2SI, 3SI, and Southfield IT—were independently controlled and managed such that Defendants could charge MDOT artificially inflated prices for fictitious rental "costs." *See id.* at PageID.1516–19. Each SSI Group company played a distinct role in this scheme.

### i. 2SI

2SI was SSI's equipment supplier. As alleged, Defendant Brian Bartlett organized 2SI in 2004. ECF No. 88-1 at PageID.471 (sealed). Defendant Jeffrey Bartlett was held out as 2SI's owner. ECF No. 132 at PageID.1518. And both Bartletts, as well as Defendant Thelen, were authorized signers on both 2SI's and 3SI's bank accounts. ECF No. 88-1 at PageID.471 (sealed). Moreover, the Government alleges 2SI did not conduct significant business with "any clients other than SSI" and was funded "nearly exclusively by SSI, its executives, or their spouses." *Id.* at PageID.535; *see also id.* at PageID.478 (alleging that, from January 2016 through February 2019, 99.2% of 2SI's funding came from SSI).

Despite this evidence of common control and the alleged Secret Agreement, the Government claims that Defendants told MDOT that 2SI was wholly independent from SSI and fraudulently sought MDOT's full reimbursement for "costs" SSI purportedly "incurred" through agreements to "rent" 2SI's equipment.

> For example, in 2017, SSI leased a mobile surveying scanner from 2SI. Under the terms of the lease agreement, SSI paid 2SI $13,000 per month to rent the scanner. However, SSI could only use the scanner on 26 days throughout the year and owed 2SI $6,000 each day it used the scanner in excess of this limitation. According to a spreadsheet Defendant Semenchuk provided MDOT auditors in 2018, later obtained by the FBI, SSI used the mobile scanner on 40 days throughout 2017, such that SSI should have paid no more than *$84,000* for its excessive use. But SSI billed MDOT *$1,398,045* for its excessive scanner use that year. Aside from this inflated excessive-use bill, the Government alleges that, since 2SI and SSI were commonly controlled, SSI was only entitled to recover the depreciation of the two scanners it rented from 2SI—totaling approximately *$200,000* per year. Yet, SSI billed MDOT *$1,553,045* for the annual use of the rented scanners. In total, MDOT auditors estimate that, as a result of Defendants' fraudulent misrepresentations, MDOT overpaid SSI for mobile-scanner-rentals by $3,893,631 from 2016 through 2018.

*United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 4533554, at *5 (E.D. Mich. Oct. 21, 2024) (citations omitted) (emphasis in original).

In addition to mobile surveying equipment, SSI also rented company cars from 2SI and, as alleged, similarly inflated these rental costs to fraudulently increase MDOT's reimbursement:

> [F]rom 2013 through 2017, SSI entered into five rental agreements with 2SI for company cars. According to rental agreements, SSI paid 2SI $1,700 per month for new cars and $1,000 per month for used cars. SSI paid 2SI nearly $1,000,000 to rent 56 separate cars throughout FY 2017 alone, and billed MDOT for this cost. But the FBI's investigation revealed that SSI paid above-market[ ] rates for these cars. For example, the FBI found that one of the 56 cars SSI rented from 2SI was a truck that SSI rented from 2014 through 2018. The four year total of SSI's rental costs for this truck, billed to MDOT, was *$81,600*. But, according to the Government, the MSRP of the truck is only *$35,310*. Aside from market value, the Government alleges that, because 2SI and SSI were commonly controlled, SSI was only entitled to reimbursement for the actual cost of each car's ownership. On this point, and as a further example of Defendants' overbilling, the FBI concluded that depreciation for the specific truck would have been approximately *$7,062* per year, less than half of the *$20,400* SSI included in its overhead rate subject to MDOT reimbursement.

In total, MDOT estimates that SSI overbilled MDOT on rental car costs by $2,038,528.70 from 2016 through 2018.

*Id.* at *6 (citations omitted) (emphasis in original).

And Defendants were not shy about their intent to use 2SI to artificially inflate SSI's reimbursements and overbill MDOT. For example, in March 2015, Defendant Jeffrey Bartlett emailed all other Defendants asking whether he should buy a new suburban "through SSI or 2SI" and recognized that "the only reason [Defendants] buy things through 2SI [is] to mark [them] up to get more money out of SSI[.]" ECF No. 113-3 at PageID.1373. In total, the Government alleges that Defendants overbilled MDOT by nearly $6,000,000 from 2016 through 2018 through fraudulent misrepresentations regarding 2SI. *See* ECF No. 88-1 at PageID.475–76 (sealed).

### ii. 3SI

3SI was SSI's landlord and leased SSI its offices and headquarters in St. John's and Standish, Michigan. *Id.* at PageID.468. Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen co-founded 3SI in 2009 and were, at all relevant times, authorized signers on 3SI's bank account. *Id.* Recall that all Defendants agreed to equally own 3SI and SSI in the alleged 2011 Secret Agreement. *See* ECF No. 132 at PageID.1514–15. As with 2SI, 3SI allegedly "did not conduct significant financial transactions with" any other entities, and was "funded nearly exclusively by SSI, its executives, or their spouses." ECF No. 88-1 at PageID.467 (sealed). Indeed, from January 2016 through February 2018, 99.8% of the deposits to 3SI's bank account "were from accounts controlled by SSI or 2SI[.]" *Id.* at PageID.478.

Yet, as with 2SI, the Government alleges Defendants held 3SI out as independent from SSI to artificially inflate MDOT's reimbursement for SSI's rental expenses. ECF No. 132 at PageID.1519. For example, in 2017, MDOT wired *$217,720* to SSI to reimburse it in full for its cost to rent its Standish headquarters from 3SI. ECF No. 88-1 at PageID.506 (sealed). But, had

- 12 -

Defendant disclosed their alleged common control of both entities, they only would have been entitled to recover the "normal cost of ownership" for this building, which the Government estimates totaled $*20,538* at the time. *See id.* (noting the building had a "conservative" initial value of $450,000, such that, considering a 39-year useful life, annual depreciation would total approximately $11,538 and annual taxes would total $9,000). Ultimately, MDOT auditors estimate that Defendants overbilled MDOT for its "real property rental costs" to 3SI by $515,550.85 from 2016 through the end of FY 2018. *Id.* at PageID.508.

### iii. Southfield IT

As its name suggests, Southfield IT was SSI's IT provider.[6] Southfield IT was founded by Defendant Ball. *Id*. at PageID.463. Southfield IT's P.O. Box was allegedly obtained by SSI office manager Courtney Stodolak. *Id*. at PageID.464; *see also United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 1715397, at *3 (E.D. Mich. Apr. 22, 2024) (noting Stodolak was "the longest-serving SSI employee"). In February 2015, Southfield IT opened a bank account and listed Defendant Ball as one of its signers. ECF No. 132 at PageID.1517. Other signers included Defendants Thelen and Brian Bartlett. ECF No. 88-1 at PageID.465 (sealed). Once Southfield IT's account was opened, the Government alleges 99.9% of its funding was furnished through SSI and Defendants. *Id.* at PageID.464–65; *see also* ECF No. 132 at PageID.1517. The Government also alleges 95.9% of these funds were "ultimately transferred back" to Defendants and their spouses. ECF No. 132 at PageID.1517. Indeed, the following withdrawals were made from Southfield IT's bank account from January 2016 through 2019:

---

[6] Southfield IT was the registered trade name for National Elevation Certificates, LLC ("NEC"). *See* ECF Nos. 132 at PageID.1510; 88-1 at PageID.463 (sealed). Although some portions of the record refer to Southfield IT as "NEC," this Opinion and Order will use only the former for consistency.

| Description / Withdrawing Party | Percentage of Account Funds Withdrawn from 2016–2019 | Total Amount Withdrawn |
|---|---|---|
| Defendant Adam Ball | 71% | $3,955,057 |
| Tara Semenchuk | 14% | $776,601 |
| Sarah Ball | 11% | $602,674 |
| Martin Chevrolet[7] | 1% | $62,920.64 |
| Network Services Group | 1% | $53,118.15 |
| Internet Service Providers | 1% | $52,689.58 |
| Other Expenditures | 1% | $39,377 |
| **Total:** | **100%** | **$5,566,909.97** |

ECF No. 88-1 at PageID.465 (sealed).

Despite this evidence of common control, Defendants allegedly told MDOT that Southfield IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs which were then reimbursed by MDOT." ECF No. 132 at PageID.1516. SSI billed MDOT a total of *$1,575,304.30* for IT services that it purportedly purchased from Southfield IT throughout FY 2015, 2016, and 2017. ECF No. 88-1 at PageID.463 (sealed). But an FBI investigation concluded that SSI actually spent "less than *$145,184.73* on IT services . . . from January 2016 through February 2019." *Id.* (emphasis added). MDOT estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 "as a result of [Defendants'] fraudulent representations regarding IT expenditures." *Id.* at PageID.467.

Notably, the Government also uncovered evidence suggesting that Southfield IT was a sham. Throughout its investigation, the FBI interviewed "Individual A," the owner of Network Services Group (NSG). *Id.* at PageID.466–67. Individual A reported to the FBI that NSG—rather than Southfield IT—provided SSI with IT services as early as 2009. *Id.* at PageID.466. Defendants'

---

[7] On August 30, 2016, Southfield IT issued a $62,920.64 check to Martin Chevrolet, which Defendant Adam Ball signed. ECF No. 88-1 at PageID.465, n. 6 (sealed). But, on July 11, 2019, FBI agents "observed Sarah Ball"—Defendant Ball's wife—driving a 2016 Chevrolet Suburban, registered to Southfield IT on August 31, 2016. *Id.* Despite the car's registration, FBI agents observed Sarah driving the car for personal purposes, such as dropping her children off at daycare and going to the gym. *Id.*

emails corroborate this interview. On December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted that all Defendants had discussed "forming an IT company for OH reasons"[8] and suggested that "all of [NSG']s bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." ECF No. 113-1 at PageID.1007 (sealed). Defendant Jeffrey Bartlett replied, "I Like it!" *Id.* at PageID.1008. Defendant Adam Ball replied, "Sounds good to me. Creative." *Id.* at PageID.1010. Defendant Brian Bartlett replied, "I think it sounds pretty crafty—I like it[.]" *Id.* at PageID.1012. Defendant Thelen replied, "[s]ounds legit." *Id.* at PageID.1013. In accordance with these emails, Individual A reported that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

  If this SSI Group structure seems confusing, you are not alone. The structure seems to have confused Defendants, too. In April 2011, far before Southfield IT was incorporated, Defendant Brian Bartlett emailed all other Defendants stating, "I really think that the 5 of us need to sit down[, have] a couple of beers[,]" and think of a "better structure to the org chart for ourselves" to "keep our stories straight." ECF No. 113-2 at PageID.1138 (sealed). Defendant Brian Bartlett replied that he was "not even sure what to say" to clients about which entity owned scanners and that all Defendants need[ed] to sit down" and "keep all of [their] lies straight so [they] d[id]n't look like idiots." *Id.* at PageID.1142.

---

[8] The Government alleges that "OH" referred to SSI's reimbursable overhead rate. *See* ECF No. 113-1 at PageID.974–75.

**b. Direct Labor Costs and Payroll Representations**

In addition to fraudulently misrepresenting SSI's relationship to 2SI, 3SI, and Southfield IT to artificially inflate SSI's reimbursable *overhead rate*, the Government alleges that Defendants artificially inflated SSI's reimbursable *direct labor costs* by billing MDOT for work their spouses and romantic partners never performed. ECF No. 132 at PageID.1510, 1519–20.

On September 25, 2015, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Anthony Thelen, Adam Ball, and Andrew Semenchuk an email entitled "Our Hours," which stated the Defendants would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate*." ECF No. 113-2 at PageID.1352 (sealed) (emphasis added). In addition to suggesting Defendants "come up with additional scanner charges" from 2SI, Defendant Ball asked the group whether Defendants could "raise hours/wages for [their] wives." *Id.* Defendant Jeffrey Bartlett responded that Defendants "may have to give [their wives] bigger raises to *help out on overhead*[.]" *Id.* (emphasis added). And, in May 2016, Defendant Semenchuk emailed all Defendants suggesting they tell MDOT that their wives "performed marketing duties" because Defendants gave their wives "large bonuses" which "need[ed] to [be] justif[ied]." ECF No. 113-3 at PageID.1387.

Consistent with these emails, SSI's 2017 payroll identified that four of the five Defendants' spouses—Sarah Ball, Jenny Bartlett, Celena Thelen, and Jessica Bartlett—worked on various MDOT contracts as "project assistants." ECF No. 88-1 at PageID.480 (sealed). But, as alleged, "none" of these spouses assisted any SSI project. *Id.* Indeed, the FBI's investigation revealed that at least two of the Defendants' spouses had other full-time jobs. *Id.* at PageID.481. In 2019, local news covered the opening of Jenny Bartlett's spa in Midland, Michigan, and reported that she had previously owned spas in Michigan and California. *Id.*; *see also* Lori Qualls, *Swae'*

*Spa Offers Relaxation - Naturally*, MIDLAND DAILY NEWS (Mar. 12, 2019, 7:33 AM), https://ww

w.ourmidland.com/news/article/Swae-spa-offersrelaxation-nbsp-naturally-13681099.php.     And

Sarah Ball has purportedly taught at a high school in Saginaw, Michigan, since 2001. ECF No. 88-

1 at PageID.481 (sealed). Moreover, the timesheets Defendants provided MDOT to corroborate

their wives' work contained "differing signatures." *Id.* Yet, Defendants' spouses and partners were

among the highest-paid "employees" at SSI, and received hundreds of thousands of dollars in

annual bonuses. *Id.* In FY 2017 alone, Defendants' spouses and romantic partners were

compensated as follows:

| Spouse/Partner | Hourly Pay | Bonus | Total Compensation |
|---|---|---|---|
| Sarah Ball (Adam Ball) | $36,420 | $83,000 | $119,420 |
| Jenny Saxman (Jeffrey Bartlett) | $58,080 | $70,800 | $128,880 |
| Celena Thelen (Anthony Thelen) | $58,080 | $84,000 | $142,080 |
| Jessica Bartlett (Brian Bartlett) | $58,080 | $79,800 | $137,880 |

*Id.* at PageID.480. Ultimately, MDOT estimates that, from 2016 through 2018, it overpaid SSI

approximately $850,360.14 as a result of Defendants' alleged fraudulent payroll

misrepresentations. *Id.* at PageID.481.

### 3. End of Year Equalization

But where did Defendants' alleged overbilling profits go? According to the Government,

all proceeds were funneled directly and indirectly back to Defendants and their spouses. ECF No.

132 at PageID.1520–22. Indeed, the Government alleges Defendants personally benefit from the

fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group

companies—SSI, 2SI, 3SI, and Southfield IT—such that each Defendant received, consistent with

the 2011 Secret Agreement, their 20% share of the Group's net income at the end of each fiscal

year. *Id.* To do so, the Government alleges Defendants offered fictitious "loans" to one another and

took fake loans from the SSI Group entities, with the expectation that the loans would never be

repaid.[9] *Id.*

For example, according to the Second Superseding Indictment, on December 28, 2017,

Defendant Jeffrey Bartlett sent an email to SSI's accountant titled "SSI Equalization[ ]" stating:

> I guess I personally was thinking more on the lines of getting "loans" from SSI in
> the 2017 year that we know would never be paid back and keep us all equal from
> year to year.

*Id.* at PageID.1521. Three minutes later, Semenchuk sent Ball, Thelen, and Brian Bartlett an email

titled "Update & Question" stating:

> [E]xactly bonuses to keep me under $350 and the rest loans that will never be paid
> back.[ ]

*Id.* Five minutes later, Ball responded:

> I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did
> not show monster loans on the books to the owners for DBE.

*Id.* Nine minutes later, Brian Bartlett responded:

---

[9] Evidence also suggests Defendants used loans to keep their "books clean" and avoid
administrative or criminal investigation. In October 2016, SSI's office manager emailed all
Defendants with a "breakdown" of SSI, 2SI, 3SI, and Southfield IT's bank accounts. ECF No. 113-
1 at PageID.1032 (sealed). Defendant Ball responded, "[s]hould we take some out of [SSI's]
account again? Probably a little risky keeping that much in there[.]" *Id.* Defendant Semenchuk
replied:

> I think what we should do, is make a payment to 2SI for some days []of scanner use
> [s]o Brian [Bartlett] and [Anthony Thelen] [c]an take their loans/distributions from
> 2[SI] and do an IT payment as well (for Adam [Ball]) to [Southfield IT].
>
> This method keeps the SSI books clean. Jeff [Bartlett] and I will take loans from
> SSI. At the end of the year, Jeff and I will have to pay our loans back . . . [a]nd then
> [can] take the loans from 2SI/[Southfield IT] like we did last year.
>
> I know it is complicated and paranoia, but [] stay with the flow (clean books) . . .
>
> Or just all take loans from SSI and sort it out later . . .

*Id.* at PageID.1031.

> I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and [Southfield IT] because they are maxed out. Then we would do so after the first of the year for Adam [Ball], Brian [Bartlett], [Anthony Thelen] and Jeff [Bartlett]. Andy [Semenchuk] would get loans from SSI then . . .

*Id.* at PageID.1522.

## B. Procedural Posture

Trial is currently scheduled to begin in September 2025. ECF No. 203. But several pretrial motions must be addressed first. This Opinion & Order resolves four: (1) Defendants' Motion to Strike and Preclude an "Invalid Theory of Prosecution," ECF No. 160; (2) Defendants' Motion to Dismiss Multiplicitous Counts, ECF No. 161; (3) Defendants Motion to Dismiss under the Rule of Lenity, ECF No. 178; and (4) Defendant's Motion to Dismiss Count IV, ECF No. 209. Each motion will be addressed in turn.

## II. Defendants' Motion to Strike and Preclude "Invalid Theory of Prosecution"

First, on December 12, 2024, Defendant Semenchuk filed a Motion to Strike and Preclude all Allegations Arising from an Invalid Theory of Prosecution. ECF No. 160. All other Defendants have since filed notices of joinder and concurrence. ECF Nos. 172; 175; 187; 205. Collectively, Defendants seek to strike all reference to their alleged DBE scheme from the Second Superseding Indictment under Criminal Rule 7, and preclude the Government from presenting evidence of this scheme at trial. *See generally* ECF No. 160. But, as explained below, the DBE allegations are relevant and material to all Counts of the Second Superseding Indictment. So Defendants' Motion to Strike will be denied.

### A.

Under Criminal Rule 7(d), defendants may file motions to "strike surplusage" from the operative indictment. FED. R. CRIM. P. 7(d). "This Rule is properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors." *United States v.*

*Kemper*, 503 F.2d 327, 329 (6th Cir. 1974); *see also* FED. R. CRIM. P. 7(d) advisory committee's note to 1644 amendment ("This rule . . . protect[s] the defendant against immaterial or irrelevant allegations in an indictment[] which may . . . be prejudicial."). But the decision to strike lies within "the sound discretion of the district court," and the Sixth Circuit has repeatedly recognized that Rule 7 should be "strictly construed against striking surplusage." *Id.* Indeed, Rule 7(d) motions are "disfavored and should only be granted if it is clear the language in the indictment is both irrelevant and prejudicial." *United States v. Mills*, No. 16-CR-20460, 2019 WL 1915762, at *3 (E.D. Mich. Apr. 30, 2019) (citing *United States v. Neller*, 229 F.3d 1154, at *2 (6th Cir. 2000)). And "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) (quoting *United States v. Thomas*, 875 F.2d 559, 562 n. 2 (6th Cir.), *cert. denied*, 493 U.S. 867 (1989)).

### B.

Defendants do not clear this high hurdle. The DBE allegations that Defendants seek to strike are largely listed throughout Counts I and II of the Second Superseding Indictment. *See* ECF No. 196-1. But these two conspiracy counts require the Government to prove the threshold element that Defendants *agreed* to commit wire fraud and defraud the United States, respectively. *See United States v. Cunningham*, 679 F.3d 355, 373 (6th Cir. 2012); *United States v. Khalife*, 106 F.3d 1300, 1302 (6th Cir. 1997). Yet, many of the "DBE allegations" Defendants seek to strike are the precise emails, documents, and correspondence that the Government hopes to use at trial to show Defendants' agreement. *See* ECF No. 196-1 (seeking to strike, for example, (1) Defendants' alleged collective agreement that Semenchuk join SSI and falsely represent to MDOT that he "had ultimate managerial control," (2) Defendants' August 2014 email celebrating the anticipated success of their

fraud, noting that it was "no[t] bad for a bunch of white guys trying to be a minority owned business," exclaiming that they would "be billing the FUCK" out of MDOT; (3) Defendants' emails discussing the end-of-year equalization of ill-gotten gains).

Similarly, to succeed on the conspiracy to defraud the United States charge in Count II, the Government must additionally prove that at least one Defendant took at least one overt act in furtherance. *See United States v. Rogers*, 769 F.3d 372, 380 (6th Cir. 2014). And the Government expressly alleges that Defendants' DBE scheme was orchestrated and executed in furtherance of their overarching fraudulent overbilling fraud. *See* ECF No. 132 at PageID.1513–14 (characterizing the DBE scheme as one of many "manners and means" of Defendants' conspiracies), PageID.1524 (alleging "[D]efendants agreed [that] Semenchuk [would] pretend[] to be a 51% owner of SSI and applied for DBE status for SSI" as an "overt act" in furtherance of Defendants' conspiracy to defraud).

In this way, the Government seeks to prove these DBE allegations at trial to satisfy the necessary elements of the conspiracies charged in Counts I and II. So the DBE allegations "cannot be considered surplusage no matter how prejudicial[.]" *Moss*, 9 F.3d at 550; *Thomas*, 875 F.2d at 562 n. 2.

## C.

Defendants do not argue otherwise. Indeed, Defendants' Motion to Strike wholly ignores how the DBE allegations may be relevant to the conspiracies charged in Counts I and II, and instead maintains they are irrelevant to wire fraud as charged in Counts III—XV. Defendants' argument is predicated on Sixth Circuit and Supreme Court precedent rejecting the "right to control theory" of wire fraud. Specifically, Defendants argue that—even if they obtained SSI's DBE certification through false and fraudulent representations—they only deprived MDOT of its

intangible right to accurate information throughout their economic decision making, but this is an "invalid theory" of wire fraud, so any reference to their alleged DBE scheme is prejudicial and irrelevant. *See id.*

As explained below, Defendant's interpretation of case law is sound, but their interpretation of the Second Superseding Indictment is not. True, the Government alleges Defendants made material misrepresentations to trick MDOT into falsely certifying SSI as a DBE. *See generally* ECF No. 132. But this is only the "front end" of Defendants' alleged wire fraud. *See supra* Section I.A. The Government ultimately alleges that, regardless of whether a contract was awarded to SSI as a result of its DBE certification, Defendants artificially created and inflated reimbursable expenses, depriving MDOT of millions of dollars in federal funds through fraudulent overbilling. *Id.*; *see also* ECF No. 66 at PageID.282. Because this cold, hard cash is a well-recognized traditional property interest, and because the Government alleges Defendants' DBE scheme allowed them to overbill more—or, at least, Defendants *thought* it would—the alleged DBE scheme is relevant and material to the wire fraud charges, too.

### 1.

As charged in Counts III through XV, the federal wire fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Historical context helps "hack[] through this textual thicket." *United States v. Thrush*, No. 1:20-CR-20365, 2025 WL 559227, at *5 (E.D. Mich. Feb. 19, 2025)

Enacted in 1872, the original federal mail fraud statute—largely analogous to the federal wire fraud statute—"contained a general prescription against . . . any scheme or artifice to

defraud." *McNally v. United States*, 483 U.S. 350, 356 (1987). The Supreme Court first interpreted this phrase in 1896. In *Durland v. United States*, the Court held that such schemes and artifices to defraud should be interpreted broadly, but only addressed fraud as it related to traditional property rights like money. 161 U.S. 306, 313 (1896) (noting the phrase "includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future"). Congress codified this holding in 1909 and amended the mail fraud statute to criminalize any "scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]" Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130 (emphasis added).

This ambiguous amendment divided lower courts: "[b]ecause the two phrases identifying the proscribed schemes [were] disjunctive," courts disagreed about whether the "money-or-property requirement of the latter phrase" limited the former scheme-or-artifice phrase which, interpreted independently, could include broad schemes to defraud intangible rights. *McNally*, 483 U.S. at 358. But the Supreme Court resolved this ambiguity in 1987 and held that the statute did not concern intangible rights and, instead, "reached false promises and misrepresentations as to the future as well as other frauds *involving money or property*." *Id.* at 359 (emphasis added) ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."). The Supreme Court reinforced this rationale in subsequent cases. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19 (1987) (upholding convictions under mail fraud and wire fraud statute when defendants defrauded the Wall Street Journal of confidential business information because such "has long been recognized as property"); *but see United States v. Murphy*, 836 F.2d 248 (1988) (dismissing mail fraud convictions under 18 U.S.C. § 1341 because, although the defendant lied

in his non-profit bingo permit application with the Tennessee Secretary of State, Tennessee's "right to accurate information with respect to its issuance of . . . bingo permits[] to charitable organizations" was not a tangible, traditional property right).

In response, Congress enacted a provision that expressly included schemes to deprive a victim of the intangible "right of honest services" as a "scheme or artifice to defraud" for wire fraud purposes. *See* 18 U.S.C. § 1346; *see also Cleveland v. United States*, 531 U.S. 12, 20 (2000) (noting federal courts traditionally protected this sole intangible right before *McNally*).

The Sixth Circuit's 2014 decision in *United States v. Sadler* provides an apt—albeit somewhat abrogated—analysis of these contours. In that case, husband-and-wife defendants Nancy and Lester operated pain management clinics that provided real patients "with hydrocodone, oxycodone, and other pain medications" after sham appointments, and prescribed such medication to "phantom" and "make-believe" patients to allow defendants to funnel opioids to the streets "at a significant profit." 750 F.3d 585, 588–89. Relevantly, Nancy also ordered opioids "directly from pharmaceutical companies" even though none of her clinics "ever obtained a license to dispense controlled substances." *Id.* at 589. "To get around that problem," Nancy represented herself to the pharmaceutical companies as a doctor. *Id.* (noting Nancy "ordered[ed] the drugs by using the clinic doctor's DEA registration number."). The Government charged Nancy with, among other crimes, wire fraud. *Id.* And the jury convicted her. *Id.*

But the Sixth Circuit reversed the wire fraud conviction on appeal for two reasons. First, although Nancy undoubtedly deprived the pharmaceutical companies of tangible pills, she paid full price. *Id.* at 590. And "paying the going rate for a product," the Sixth Circuit held at the time, "does not square with the conventional understanding of" a "deprivation" for wire fraud

purposes.[10] *Id.* Second, to the extent the Government argued that the companies would not have

sold the pills to Nancy but for her lies, the Sixth Circuit held that depriving someone of their "right

to accurate information" does not deprive any traditional, tangible property interest and thus does

not violate the wire fraud statute. *Id.* at 590–91; *see also* 18 U.S.C. § 1343 (emphasizing schemes

to "obtain[] money or property").

In short, the Sixth Circuit summarized that "money, property, and the intangible right of

honest services clearly and definitively fall within the fraud statute's scope, but other interests—

such as the right to accurate information—do not." *Id.* at 592 (internal quotations and citations

omitted). In so doing, the Sixth Circuit rejected the "right-to-control theory" of wire fraud

recognized by other Circuits. *See, e.g.*, *United States v. Binday*, 804 F.3d 558, 570 (2nd Cir. 2015)

(finding actionable wire fraud when a defendant's scheme "denies the victim of the right to control

its assets by depriving it of information necessary to make discretionary economic decisions").

The Supreme Court followed suit in 2023: "In sum, the wire fraud statute reaches only traditional

property interests. The right to valuable information needed to make discretionary economic

decisions is not a traditional property interest."[11] *Ciminelli v. United States*, 598 U.S. 306, 316

(2023).

---

[10] This holding is no longer good law. *See infra* n.11 (discussing *United States v. Kousisis*, 2025 WL 1459593 (U.S. May 22, 2025) and the Supreme Court's recent recognition of the "fraudulent inducement" theory of wire fraud).

[11] Given its recency and facial factual similarity, it is important to distinguish the "right-to-control" theory of wire fraud as *rejected* in *Sadler* and *Ciminelli* from the "fraudulent inducement theory" of wire fraud as recently *recognized* by the Supreme Court in *Kousisis v. United States*, No. 23-909, 2025 WL 1459593 (U.S. May 22, 2025). In *Kousisis*, an industrial painting company and its manager secured two prime contracts from the Pennsylvania Department of Transportation (PennDOT), after affirming the company would subcontract with DBEs to complete certain portions of the awarded contract. *Id.* at *3–4. But "[t]his was a lie." *Id.* at *4. In truth, these defendants orchestrated a scheme to use a DBE subcontractor as a mere "pass-through entity." *Id.* "By the time the last coat of paint had dried," defendants "had turned a gross profit of over $20 million" and the sham DBE subcontractor received $170,000 in kickbacks for its "pass-through

services." *Id.* A jury convicted the defendants of wire fraud and conspiring to commit wire fraud. *Id.* But the defendants sought acquittal, arguing that they completed the work each contract called for, so they did not *deprive* PennDOT or any other party of money or any other traditionally recognized property right. *Id.* The district court rejected that argument, and the Third Circuit affirmed the defendants' wire fraud convictions. *Id.* So did the Supreme Court.

On appeal, the Supreme Court recognized the circuit split on whether a wire fraud charge can stick when a defendant fraudulently induces a victim into giving them property or money, but the defendant "did not seek to cause the victim net pecuniary loss." *Id.* In other words, is it really fraud if the victim receives the full benefit of their bargain? Before *Kousisis*, the Sixth Circuit—and many federal appellate courts—said "no." *See Sadler*, 750. F3d at 590–92 (finding no tangible property right was deprived because, although the defendant fraudulently induced pharmaceutical companies to sell her pills, she paid full price for the pills). But the Supreme Court unanimously said "yes". The Court's rationale was twofold. First, nothing in the text of the federal wire fraud statute prevents convictions predicated on fraudulent inducement. *Kousisis*, 2025 WL 1459593, at *5–6. To the contrary, so long as the object of the inducement is to obtain money or another traditional property interest, all elements of § 1343 are satisfied regardless of whether the victim experiences economic loss. *Id.* ("[T]he wire fraud statute is agnostic about economic loss.") Second, the Court also concluded that economic loss was not required for fraud convictions at common law. *Id.* at *6–9. And the Court reinforced its conclusion by highlighting prior precedent that recognized the fraudulent inducement theory and rejected contentions that economic loss is necessary to convict a defendant of wire fraud. *Id.* at *10 (citing *Carpenter v. United States*, 484 U.S. 19 (1987) and *Shaw v. United States*, 580 U.S. 63 (2016)).

Importantly, before concluding, the Supreme Court distinguished this now-recognized "fraudulent inducement" theory of wire fraud from the "right to control" theory it rejected in *Ciminelli* (and the Sixth Circuit rejected in *Sadler*). *See id.* at *11. The recognized "fraudulent inducement" theory concerns *how* a right is deprived by a defendant, whereas the rejected "right to control" theory concerns *what* is deprived. The Court rejected the "right to control" theory because, absent the one explicit statutory exception for "honest services," 18 U.S.C. § 1346, a wire-fraud conviction cannot stand when a defendant deprives a victim of merely intangible rights—like the right to accurate information. Instead, the devised scheme must intend to deprive a victim of their "money or property." 18 U.S.C. § 1343. The Court's acceptance of the "fraudulent inducement" theory does not undermine this conclusion and instead adds to it: properly assuming a defendant devised a scheme to deprive a victim of their "money or property," such scheme sounds in wire fraud even if the victim receives the benefit of their bargain or there is no net economic loss. *See Kousisis*, 2025 WL 1459593, at *11 ("Unlike the right-to-control theory, fraudulent inducement does not treat mere information as the protected interest. Rather, it protects money and property." (internal citations and quotations omitted)).

Here, Defendants recognize that *Kousisis* is inapposite because the Government does not only allege that Defendants fraudulently induced MDOT to award SSI contracts through the DBE Program. ECF No. 160 at PageID.1731. Here, unlike in *Kousisis*, the Government additionally alleges that Defendants tricked MDOT into *overpaying* SSI on contracts it received, regardless of DBE status. *See id.* However, after the Court's recent decision in *Kousisis*, it seems Defendants'

**2.**

Here, the Government alleges Defendants deprived MDOT of far more than the intangible right to accurate information. To the contrary, the Government alleges Defendants devised a scheme to deprive MDOT of "millions of dollars" throughout a decade-long conspiracy—flush with false representations and omissions. ECF No. 66 at PageID.282; *see also* ECF No. 132; *supra* Section I.A. In this way, the Government is not "charging [Defendants] with fraud to obtain[] *contracts* . . . but with fraud to obtain the *money* from them." *United States v. Bolos*, 104 F.4th 562, 570 (6th Cir. 2024) (emphasis in original). This is a viable wire fraud theory, and the alleged DBE scheme is relevant and material to this theory for three reasons.

First, the Government has alleged—and the record reflects—that SSI's allegedly false DBE certification may have resulted in increased contracting opportunities, allowing Defendants to overbill more. *See* ECF No. 132 at PageID.1513–15 (alleging Defendants' DBE scheme was a "manner and means" of their conspiracy to commit wire fraud and was executed to "further their scheme to defraud" MDOT through overbilling). As the Government has explained, MDOT sets DBE "participation goals" on certain awarded contracts. *See* ECF No. 185 at PageID.1884; *see also* Mich. Dep't of Trans, DBE Program Procedures, 67 (2023). If a contract has a DBE goal, and the prime contractor is not DBE-certified, the contractor must select a DBE subcontractor to complete MDOT's goal. *See* Mich. Dep't of Trans, DBE Program Procedures, 67 (2023). The

---

DBE scheme may be indictable as wire fraud in itself—even absent the additional overbilling allegations—if the Government alleged Defendants devised a scheme to obtain MDOT contracts they were not otherwise entitled to through fraudulent misrepresentations about SSI's ownership and control. After *Kousisis*, it matters not that MDOT or prime contractors would have awarded these contracts or subcontracts to other entities. As alleged, even ignoring the Government's core overbilling allegations, Defendants devised a scheme for SSI to obtain contracts through false certification as a DBE. "Their goal? To obtain money . . . from [M]DOT. And how? By making a number of false or fraudulent representations[.] Section 1343 requires nothing more." *Kousisis*, 2025 WL 1459593, at *6 (cleaned up).

Government alleges that, during the time charged in the Indictment (2011–2019), SSI "was a subcontractor in 175 MDOT . . . contracts that included DBE [participation] goals." ECF No. 185 at PageID.1886. In 95 of those subcontracts, "SSI was DBE eligible and [its] work was included" to fulfill the prime contract's DBE participation goal, often entirely. *Id.*; *see also* ECF No. 185-1 at PageID.1892–94.

Second, even if Defendants' DBE scheme did not result in increased contracting and overbilling opportunities for SSI, the Government alleges—and the record reflects—that Defendants *thought* it would. Defendants' emails speak for themselves. *See* ECF No. 132 at PageID.1516 ("Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be *billing* the FUCK out of August thru November for sure." (emphasis added)). Wire fraud is a specific intent crime. *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998); *accord United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003). So the Government must prove that each Defendant intended to deprive MDOT of money. *See id.* The Government's DBE allegations support such intent and, in this way, cannot be struck as surplusage under Criminal Rule 7.

Third, as the Government explained in response to Defendants' Motion to Strike and Preclude, many of the statements Defendants made to MDOT to falsely obtain and maintain SSI's DBE certification are "inextricably interwoven" with the statements Defendants made to MDOT to artificially inflate their reimbursable expenses. ECF No. 185 at PageID.1887–89. For example, to maintain SSI's DBE certification, Defendants Semenchuk and Jeffrey Bartlett repeatedly "falsely certified" that Semenchuk controlled SSI and that SSI was wholly independent from 2SI, 3SI, and Southfield IT. *See* ECF No. 132 at PageID.1516 (discussing annual no-change affidavits); *see also* 49 C.F.R. § 26.71(g) (requiring DBE to "prove that it would be viable as a going concern" without existing arrangements or relationships with other companies). But these are some of the

same alleged fraudulent misrepresentations Defendants made to conceal the SSI Group's common control, so SSI would recover full rental reimbursement from MDOT, rather than the "normal costs of ownership." *See supra* Section I.A.2. Defendants call the Government's argument "contrived and insincere." ECF No. 196 at PageID.2127. But federal courts have held that "res gestae" evidence—evidence "'necessary to complete the story of the charged offense'"—should not be struck as surplusage under Rule 7. *United States v. Mullet*, No. 5:11 CR 594, 2012 WL 12865242, at *2 (N.D. Ohio May 29, 2012) (quoting *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)); *see also United States v. Settle*, No. 21-10074-02, 2022 WL 1125568, at *2 (D. Kan. Apr. 15, 2022); *United States v. Erie Coke Corp.*, No. 1:22-CR-00023-SPB, 2025 WL 1194277, at *8 (W.D. Pa. Apr. 24, 2025).

In sum, the DBE allegations that Defendants seek to strike are relevant and material to all counts of the Second Superseding Indictment. They support the Government's necessary conspiracy proofs at trial and suggest that Defendants had the necessary motive and intent to commit wire fraud. Contrary to Defendants' argument, the Government's wire-fraud theory is not "invalid." The Government alleges Defendants committed wire fraud by devising a scheme to deprive MDOT of millions in federal funds through material misrepresentations about SSI's ownership, control, and staff. As alleged, the DBE allegations played a key role in this fraud. So the allegations will not be stricken, and Defendant's motion seeking such relief will be denied.

### III. Defendants' Motion to Dismiss Multiplicitous Counts

On December 12, 2024, Defendant Jeffrey Bartlett filed a motion to dismiss either Count I or Count II, contending that the charged conspiracies are multiplicitous in violation of the Fifth Amendment double jeopardy clause. ECF No. 161. Defendants Ball and Brian Bartlett have since

filed notices of joinder and concurrence. ECF Nos. 168; 176. But Counts I and II charge violations of separate statutes and are not impermissibly multiplicitous, so Defendants' motion will be denied.

### A.

The Fifth Amendment provides that no person "shall be subject for the same offen[s]e to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This "double jeopardy" clause protects individuals from multiple punishments or prosecutions for the same offense. *United States v. Theunick*, 651 F.3d 578, 587 (6th Cir. 2011). But the same underlying offense conduct may be properly prosecuted and punished "under *separate statutes* without violating the Double Jeopardy Clause." *United States v. Theunick*, 651 F.3d 578, 587 (6th Cir. 2011) (emphasis added) (quoting *United States v. DeCarlo*, 434 F.3d 447, 454 (6th Cir.2006)); *see also Gore v. United States*, 357 U.S. 386, 389 (1958) ("The fact that an offender violates by a single transaction several [statutes] devised by Congress as a means for dealing with a social evil . . . does not make the several [statutes] single and identic."). Beyond these broad principles, the Parties dispute the applicable analysis.

The Government argues that the infamous "*Blockburger* same-element" test applies. ECF No. 186 at PageID.1989–901. As articulated by the Supreme Court in 1932, this test is relatively straightforward. To assess whether multiple charges place a defendant in double jeopardy, courts consider whether each "contains an element not contained within the other." *United States v. Dixon*, 509 U.S. 688, 688 (1993); *see also Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("[T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."). If each charge has a unique element, the defendant has not been placed in double jeopardy. If not, the Fifth Amendment prohibits successive and simultaneous prosecution and punishment.

Defendants argue that *Blockburger* does not apply to conspiracy charges and the Sixth Circuit's "totality-of-the-circumstances" test articulated in *United States v. Sinito* applies, instead. ECF No. 161 at PageID.1739–41. In *Sinito*, a jury convicted a defendant in 1981 of participating in a RICO conspiracy that involved violations of federal loansharking laws. *Sinito*, 723 F.2d 1250, 1253 (6th Cir. 1983). But, in 1982, the Government charged the defendant with another RICO conspiracy involving drug trafficking, gambling, and obstruction of justice. *Id.* Although the *Blockburger* same elements test "would lead to the conclusion that the two indictments [were] not violative of the double jeopardy clause [s]ince both indictments charged different overt acts," the Sixth Circuit explained that "inherent infirmities" may result when *Blockburger* is applied to successive conspiracy prosecutions. *Id.* at 1256 (noting, in conspiracy cases, the government "is often presented with a host of co-conspirators and a multiplicity of overt acts" such that an "overzealous prosecutor, in drafting the indictment, could choose certain overt acts in one indictment and a different set . . . in a second indictment, thereby carving up one conspiracy into two or even more artificial offense"). So the Sixth Circuit went on to consider and compare the following five factors across both charged conspiracies:

> (1) the relevant time;
> (2) the co-conspirators;
> (3) the charged statutory offenses;
> (4) the overt acts or other offense descriptions; and
> (5) the relevant places where the conspiracy took place

*See id.* "Where several of these factors differ between the conspiracies, the conclusion follows that [they] are separate and distinct offenses." *Id.* at 1256–57.

## B.

The Government is correct. *Blockburger*—not *Sinito*—applies here, where the Government charges one conspiracy across two separate, specific statutes.

The totality-of-the-circumstances test promulgated in *Sinito* "only applies to *successive prosecutions* of multiple conspiracies of the *same statute*." *United States v. Tahir*, No. 15-20351, 2016 WL 795884, at *5 (E.D. Mich. Feb. 29, 2016) (emphasis added); *see also United States v. Benton*, 852 F.2d 1456, 1462 (6th Cir. 1988) (describing *Sinito* as the test for "determining whether separate conspiracies charged in different grand jury indictments are, in reality, one for the purposes of the fifth amendment prohibition against double jeopardy"); *United States v. Gross*, 1 F.3d 1242, 1993 WL 300393 (6th Cir. 1993) (describing *Sinito* as the test "to determine whether two successive conspiracy indictments" charge the same offense for double jeopardy purposes); *United States v. Wheeler*, 535 F.3d 446, 449 (6th Cir. 2008) (describing *Sinito* was the test "to address a double jeopardy claim in the context of successive RICO conspiracy prosecutions"); *United States v. Prater*, No. 22-5599, 2024 WL 3634526, at *2 (6th Cir. Aug. 2, 2024) (applying *Sinito* "in the context of successive conspiracy indictments").

Here, unlike in *Sinito*, the Government simultaneously alleges that Defendants' conspiracy violated two separate statutory offenses. *See* ECF No. 132. And both the Sixth Circuit and the Supreme Court agree that, when the Government charges two separate statutory offenses, *Blockburger* applies. *See Blockburger*, 284 U.S. at 304 ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied is whether each provision requires proof of a fact which the other does not."); *Theunick*, 651 F.3d at 587.

This applicability is not altered when the Government charges two separate statutory conspiracies. Consider the 1946 Supreme Court case *American Tobacco Co. v. United States*, 328 U.S. 781 (1946). There, defendants were simultaneously convicted of conspiracy in restraint of trade—in violation of 15 U.S.C. § 1—and conspiracy to monopolize—in violation of 15 U.S.C. § 2. *Id.* at 783. Those defendants appealed, arguing that these separate conspiracy convictions

violated the Fifth Amendment because both were factually predicated on "one conspiracy" to "fix prices." *Id.* at 788. But the Supreme Court rejected that argument because, applying *Blockburger*, each statutory offense required proof of "reciprocally distinguishable" elements. *Id.*

The Supreme Court reinforced this rationale nearly 40 years later in *Albernaz v. United States*, 540 U.S. 333 (1981). There, defendants were convicted of conspiracy to import marijuana—in violation of 21 U.S.C. § 963—and conspiracy to distribute marijuana—in violation of 21 U.S.C. § 846. *Id.* at 334. The Supreme Court recognized that defendants only reached one "agreement . . . to import marijuana and then distribute it domestically." *Id.* at 335. But the Supreme Court nevertheless rejected defendants' double jeopardy arguments, concluding that— under *Blockburger*—two separate statutory conspiracy charges (or sentences) are constitutionally permissible so long as each involves proof of unique elements. *Id.* at 339. ("Thus, application of the *Blockburger* rule to determine whether Congress provided that these two statutory offenses be punished cumulatively results in the unequivocal determination that [both conspiracy charges] proscribe separate statutory offenses[.]"); *see also United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) ("Thus, in *Albernaz* the Supreme Court concluded that the *Blockburger* test applies where the defendant's conduct violated multiple conspiracy statutes.")

Likewise, the Sixth Circuit has applied *Blockburger* to assess whether conspiracies charged under separate statutes impermissibly place a defendant in double jeopardy, distinguishing such circumstance from *Sinito*. *See, e.g.*, *United States v. Fowler*, 819 F.3d 298, 308 n.4 (6th Cir. 2016); *United States v. Patel*, 694 F. App'x 991, 994 (6th Cir. 2017) (noting *Sinito*'s concern with successive conspiracy charges under the same statute does not "exist when, as in the present case, the defendant is charged under separate conspiracy statutes" because these charges may be proper "[e]ven if the conspiracies arose out of the same conduct").

- 33 -

**C.**

Properly applying the *Blockburger* same-elements test, Counts I and II are not impermissibly multiplicitous.

Count I charges Defendants with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. ECF No. 132 at PageID.1512. To succeed on this Count, the Government must prove beyond a reasonable doubt that:

(1) Two or more persons conspired, or agreed, to commit the crime of wire fraud;
(2) Each Defendant knew of the conspiracy and its objects, aims, or goals; and
(3) Each Defendant joined the conspiracy with the intent that at least one of the conspirators engage in conduct that satisfies the elements of wire fraud[12]

*See* Sixth Circuit Pattern Jury Instructions 3.01A.[13]

Count II charges Defendants with conspiracy to defraud the United States in violation of 18 US.C. § 371. The elements for this offense include:

(1) Two or more persons conspired, or agreed, to defraud the United States, or one of its agencies or departments, by dishonest means;
(2) Each Defendant knew of the conspiracy and its objects, aims, or goals;
(3) Each Defendant joined the conspiracy with the intent that at least one of the conspirators engage in conduct that satisfies the elements of defrauding the United States; and

---

[12] To wit, that the Defendant intentionally devised a scheme to defraud in order to deprive another of money or property through material misrepresentations or concealments over the wires in interstate commerce. *See United States v. Thrush*, No. 1:20-CR-20365, 2025 WL 559227, at *5 (E.D. Mich. Feb. 19, 2025); *see also id.* n.4 (explaining Sixth Circuit interpretations of intent to defraud).

[13] Because Count I charges a violation of 18 U.S.C. § 1349—as opposed to § 371—the Government need not additionally prove, as in most conspiracy cases, that the Defendants engaged in overt acts. *See United States v. Rogers*, 769 F.3d 372, 380 (6th Cir. 2014) ("[C]onspiracy under 18 U.S.C. § 1349 does not require proof of an overt act in furtherance of the agreement in order to convict a defendant of the conspiracy offense."); *see also* Sixth Circuit Pattern Jury Instructions 10.02 Jan. 1, 2024 Committee Commentary ("[I]f the conspiracy is charged based on § 1349, [the instructions] should be modified to omit . . . overt acts.").

    (4) At least one member of the conspiracy engaged in at least one overt act for the
        purpose of advancing or helping the conspiracy.

*See* Sixth Circuit Pattern Jury Instructions 3.01B; *United States v. White*, 492 F.3d 380, 395 (6th Cir. 2007).

Each conspiracy charge requires proof of an element that the other does not. For example, § 1349 requires the Government to prove that each Defendant joined the conspiracy with the intent that at least one conspirator commit wire fraud. But this is not required to convict under § 371, which, uniquely, requires a governmental victim and proof of an overt act in furtherance. So, Counts I and II do not place Defendants in double jeopardy. *See Patel*, 694 F. App'x at 994 (concluding § 371 and § 1349 are not multiplicitous). So Defendants' motion to dismiss one of these counts or, alternatively, order the Government to elect between the two, ECF No. 161, will be denied.

### IV. Defendant's Motion to Dismiss Under the Rule of Lenity

Next, Defendants seek dismissal of all Counts based on the rule of lenity or, alternatively, the exclusion of all evidence at trial concerning the "common control" of the SSI Group entities. Defendant Jeffrey Bartlett filed a motion seeking this relief on January 15, 2025. ECF No. 189. All other Defendants filed notice of joinder and concurrence thereafter. *See* ECF Nos. 204; 206; 210; 214. But the rule of lenity is entirely unapplicable. So Defendants' motion will be denied.

### A.

The rule of lenity is a canon of statutory construction commonly used to resolve ambiguities in criminal statutes and their implementing regulation in favor of criminal defendants. *See Kasten v. Saint-Gobain Performance Plastics Corp*., 563 U.S. 1, 16 (2011). The rationale for the rule is twofold. First, the rule of lenity recognizes that all should have adequate notice about whether their conduct is criminal. *United States v. Bass*, 404 U.S. 336, 348 (1971). Second, the

rule preserves the separation of powers and recognizes that the legislature—not the courts—should define criminal conduct and provide such notice. *Id.*

But the rule of lenity is not leniently applied. To the contrary, "the rule of lenity only applies if, after considering the text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal citations and quotations omitted); *accord United States v. Galaviz*, 645 F.3d 347, 362 (6th Cir. 2011); *see also Shular v. United States*, 589 U.S. 154, 166 (Kavanaugh, J., concurring) (explaining that reviewing courts "will almost always reach a conclusion about the best interpretation" of a statute by employing the traditional tools of construction, such that "the rule of lenity rarely comes into play"). And even then, the resulting ambiguity must be "grievous." *Muscarello v. United States*, 524 U.S. 125, 139 (1998); *Chapman v. United States*, 500 U.S. 453, 463 (1991). "A statute is not ambiguous merely because it is '*possible* to articulate a construction more narrow than that urged by the Government.'" *United States v. Lechner*, 806 F.3d 869, 874 (6th Cir. 2015) (emphasis in original) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990).

**B.**

Defendants' motion to dismiss predicated on the rule of lenity is misplaced and meritless. Although Defendants recognize that the rule of lenity is a canon of statutory interpretation, ECF No. 189 at PageID.1936, they do not argue that any of the challenged criminal *statutes* are ambiguous. They instead rest their rule-of-lenity hat on *regulations*. Recall that, under the Federal Acquisition Regulations (FAR), contractors are generally not entitled to full rental reimbursements when the property they rent to complete an awarded contract is owned by a commonly controlled entity. 48 C.F.R. § 31.205-36(b)(3). Instead, the contractor can only receive reimbursement for the

"normal costs of ownership," such as depreciation, taxes, and maintenance costs. *Id.*; *see also supra* Section I.A.2. Defendants argue that "common control," as used in such regulation, is undefined and ambiguous, such that they had no reasonable notice that their alleged conduct was criminal. *See* ECF No. 189.

But the rule of lenity applies only to regulations that impose criminal sanctions or interpret criminal statutes. *See Bifulco v. United States*, 447 U.S. 381, 387 (1980) (noting the rule "applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose"); *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 901 (6th Cir. 2021) (noting the rule of lenity only applies to regulations if they "impose criminal sanctions"). Here, 48 C.F.R. § 31.205–36 does neither. So the rule of lenity does not apply. *See Sash v. Zenk*, 428 F.3d 132, 134 (2d Cir. 2005) (Sotomayor, J.) (declining to apply rule of lenity to a "regulation [that] interprets neither the substantive ambit of a criminal prohibition nor the penalty it imposed").

Indeed, in nearly every case Defendants rely on to support their rule-of-lenity motion,[14] the reviewing court applied the rule directly to the text of a criminal statute or the statute's express implementing regulation. *See, e.g.*, *Jones v. United States*, 529 U.S. 848, 858 (2000) (analyzing ambiguity in the federal arson statute, 18 U.S.C. § 844(i)); *Crandon v. United States*, 494 U.S. 152,

---

[14] Defendants also cite cases that do not address the rule of lenity whatsoever, and instead address the "void-for-vagueness" doctrine. *See* ECF No. 189 at PageID.1937–38 (citing *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995); *Connally v. Gen Constr. Co.*, 269 U.S. 385 (1926)). Although the rule of lenity and the void-for-vagueness doctrine are related, they are not the same. *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 266 (1997) (noting both provide defendants with a fair warning of criminal conduct but differ in approach and application). Yet Defendants clarify they are not asserting void-for-vagueness challenges. *See* ECF No. 195 at PageID.2119–20. And they would have a hard time doing so. *See Tatum*, 58 F.3d at 1107 ("That the mail and wire fraud statutes are not unconstitutionally vague is beyond dispute."); *United States v. Morosco*, 67 F. Supp. 3d 483, 489 (D. Mass. 2014) (rejecting vagueness challenge because it is "reasonably clear that § 371 may be applied to conspiracies to defraud the United States even when the underlying acts standing alone are not criminal"), *aff'd*, 822 F.3d 1 (1st Cir. 2016).

158-60 (1990) (same, for language within criminal conflicts statute, 18 U.S.C. § 209(a)); *Bittner v. United States*, 598 U.S. 85, 201 (2023) (same, for Bank Secrecy Act, 31 U.S.C. §§ 5314, 5312); *United States v. Tyson Foods, Inc*. 258 F. Supp. 2d 809, 819 (E.D. Tenn 2003) (same, for language within 18 U.S.C. § 1546(b) criminalizing use of false "identification documents"); *United States v. Phifer*, 909 F.3d 372 (11th Cir. 2018) (applying rule-of-lenity to regulation defining "positional isomer" for purposes of the criminal Controlled Substances Act, 21 U.S.C. § 841); *United States v. Caseer*, 399 F.3d 828, 832-39 (6th Cir. 2005) (same, to regulation defining "cathinone" for purposes of the criminal Controlled Substances Act). These cases are inapposite here, where 48 C.F.R. § 31.205-36(b)(c) does not implement any federal criminal statute—let alone the charged wire fraud or conspiracy statutes—nor does the regulation itself impose any criminal penalty or sanction.

Defendants also cite *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004). There, the government alleged that 43 defendants conspired to deprive McDonald's of funds throughout a promotional "Hatch, Match, and Win" game where customers could collect stamps by purchasing food, and certain stamps could be redeemed for cash prizes. *Id.* at 799. One of the alleged conspirators (the hub) worked for the marketing company that McDonald's hired to oversee the promotion, and distributed winning stamps to friends and relatives who, in turn, distributed winning stamps to individuals across the country (the spokes). *Id.* The Government charged the winning defendants with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, and a jury convicted all defendants at trial. *Id.* at 798. The conviction was predicated on the government's contention that the defendants fraudulently misrepresented themselves as "legitimate winners" when they mailed in a winning stamp. *Id.* at 804. But the Eleventh Circuit vacated the conviction on appeal because—contrary to the government's theory—McDonald's did not "explicit[ly]

prohibit[]" the transfer of winning stamps. *Id.* at 804–05. Indeed, winning stamps "were publicly traded," both "on E-bay and *McDonald's own website.*" *Id.* (emphasis in original). And the government did not otherwise prove that any defendant *knowingly* received and redeemed a stolen stamp. *Id.* So the Eleventh Circuit "doubt[ed]" whether any defendant knowingly made any fraudulent or false representations necessary to convict under § 371, and cursorily applied the "rule of lenity" to resolve this doubt in favor of the accused. *Id.*

Respectfully, this Court concludes that this aspect of *Chandler* was erroneous or, at least, imprecise. As explained and as repeatedly recognized by the Supreme Court and Sixth Circuit since *Chandler*, the rule of lenity is a tool of statutory construction and interpretation. But the Eleventh Circuit was not interpreting the ambiguity of § 371 or any regulation. Instead, the Eleventh Circuit was analyzing the propriety of acquittal and assessing whether the Government provided sufficient evidence at trial to sustain a § 371 conviction. *See id.* at 806 ("We have reversed conspiracy convictions where there was no direct proof of an agreement, and the circumstantial evidence of agreement was insufficient to support such inference."), 813 (concluding the "government did not prove that the defendants committed mail fraud" and did not "prove a single mail fraud conspiracy"). True, the Eleventh Circuit sprinkled the words "rule of lenity" into its 22-page analysis on two separate occasions. *Id.* at 805. But such sprinkles were cursory, unnecessary, and immediately preceded the court's conclusion that the government failed to prove the defendants made any knowing false or fraudulent representations when they claimed to be legitimate winners, because publicly trading the stamps was seemingly permissible. *Id.*

And *Chandler* is otherwise non-binding and distinguishable. Unlike in *Chandler*, "the Defendants in this case are alleged to have known the aim of the conspiracy and actively contributed to its success." *United States v. Nimo*, No. 22-CR-20272, 2025 WL 685456, at *3 (E.D.

Mich. Mar. 3, 2025) (refusing to dismiss conspiracy to commit wire fraud count under 18 U.S.C. § 1349). Because the rule of lenity does not apply to the non-penal 48 C.F.R. § 31.205-36(b)(3), Defendant's motion to dismiss the indictment because such regulation does not define the purportedly ambiguous term "common control" will be denied.[15]

### V. Defendant's Motion to Dismiss Count IV

The last motion is the easiest to resolve. On March 31, 2025, Defendant Semenchuk filed a Motion to Dismiss Count IV because this specific wire fraud charge is barred by the applicable five-year statute of limitations. ECF No. 209 (citing 18 U.S.C. § 3282(a)). Most of the other Defendants have since joined. ECF Nos. 216; 218; 220. On April 17, 2025, the Government responded and conceded that, based on "the documentation Semenchuk attached to his motion" and relevant MDOT records, Count IV is time-barred as to all Defendants. ECF No. 224 at PageID.2421. Accordingly, Defendant Semenchuk's Motion to Dismiss will be granted, and Count IV of the Second Superseding Indictment will be dismissed.

### VI.

Accordingly, it is **ORDERED** that Defendants' Motion to Strike and Preclude, ECF No. 160, *see also* ECF Nos. 172; 175; 187; 205, is **DENIED.**

---

[15] Even if the rule of lenity applied, and even if there was some grievous ambiguity in the term "common control" as used in 48 C.F.R. § 31.205-36(b)(3), such ambiguity would not result in the full-stop dismissal Defendants seek. As explained, the Defendants' alleged overbilling scheme— relevant to all charges—involved *two* types of fraudulent misrepresentations and omissions. Although the first concerned the concealed "common control" of the SSI Group entities, the second had nothing to do with "common control" and instead involved the work of Defendants' wives and romantic partners. *See supra* Section I.A.2.b. Defendants do not address these additional allegations. *See* ECF Nos. 189; 195. To the extent Defendants alternatively seek exclusion of all "common control" evidence at trial, ECF No. 189 at PageID.1954, they have not explained how such evidence is inadmissible. *See Arnett v. Allstate Vehicle & Prop. Ins. Co.*, No. 1:23-CV-11138, 2024 WL 3540434, at *3 (E.D. Mich. July 25, 2024) (noting evidence is subject to pretrial exclusion only when "clearly inadmissible on all potential grounds"

Further, it is **ORDERED** that Defendants' Motion to Dismiss Multiplicitous Counts, ECF No. 161, *see also* ECF Nos. 168; 176, is **DENIED.**

Further, it is **ORDERED** that Defendants' Motion to Dismiss Under the Rule of Lenity, ECF No. 189, *see also* ECF Nos. 204; 206; 210; 214, is **DENIED.**

Further, it is **ORDERED** that Defendants' Motion to Dismiss Count IV, ECF No. 209, *see also* ECF Nos. 216; 218; 220, is **GRANTED.**

Further, it is **ORDERED** that Count IV of the Second Superseding Indictment, ECF No. 132, is **DISMISSED** as to all Defendants.

**This is not a final order and does not close the above captioned case.**

Dated: June 9, 2025                                       s/Thomas L. Ludington
                                                         THOMAS L. LUDINGTON
                                                         United States District Judge