United States District Court
Eastern District of Michigan
Northern Division

United States of America,

No. 23-cr-20676

              Plaintiff,

Honorable Thomas L. Ludington

vs.

D-2 Andrew Semenchuk,

              Defendant.

_____/

## **Government's Sentencing Memorandum**

This case is ordinary in that it involves lying to get money. But it is extraordinary in that Andrew Semenchuk and his co-defendants used relentless and uncommon means executed over many years to cheat the Michigan Department of Transportation out of a staggering amount of money.

## I.    **Background**

Semenchuk pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 2). As the Court previously recognized, the charges arise from fraudulent conduct "in three parts," including "fraudulently misrepresent[ing] SSI's overhead and labor

costs to artificially inflate MDOT's reimbursement." (ECF No. 150, PageID.1623.) Semenchuk and his co-defendants overbilled MDOT through "two separate schemes flush with fraudulent misrepresentations and omissions." *Id.*, PageID.1630.

It is unnecessary to repeat the Court's full recitation of the factual allegations and evidence against Semenchuk, *see generally* ECF No. 150, PageID.1623–39, but the Court got it right. The government adopts the timeline of relevant case events, the description of the charge to which Semenchuk has pleaded guilty, and the statement of the offense conduct detailed by the probation department in the Presentence Investigation Report (PSR) dated October 8, 2025. Here, the government focuses on the particular events and facts that are relevant to the sentence this Court should impose on Semenchuk.

## II.   **Semenchuk's Participation in the Fraud**

By the time G.S., a founding owner of SSI, died, Jeff Bartlett (J. Bartlett) had already been negotiating with Semenchuk to join SSI as an owner. Their plan was that Semenchuk would start a company called Geo Precision Services (GEO) and would use GEO to apply for DBE status with Semenchuk as the qualifying minority owner. This

would allow SSI to use GEO and its DBE status when applying for MDOT contracts.  Shortly after G.S.'s death Semenchuk left his job at MDOT and joined SSI as an owner, which coincided with Adam Ball (Ball) also joining SSI as an owner.

With the addition of Semenchuk and Ball, the defendant-owners[1] of SSI needed to clarify their relationship to each other and the various SSI entities. On February 25, 2011, the defendants executed a new secret agreement in which they acknowledged that they were all equal owners in SSI and its related entities, including GEO, regardless of what publicly facing corporate documents stated. (Exhibit A).

In early March 2011, Semenchuk and Ball finalized the details of their ownership of the SSI entities. This included funding GEO by

---

[1] Semenchuk and his co-defendants have argued they were not equal owners of SSI, 2SI, 3SI, GEO, and Southfield IT (SFIT), because publicly filed documents reported that J. Bartlett and Semenchuk owned SSI, B. Bartlett and Thelen owned 2SI and 3SI, and Adam Ball and his wife owned SFIT. But all five defendants shared equally in the profits of SSI, 2SI, 3SI, and SFIT. These entities shared resources, including an office manager and bookkeeper. Management decisions for all the entities were made by all five defendants and money routinely moved between the entities at their direction. In secret agreements the defendant-owners referred to each other as equal owners regardless of what publicly filed documents reported. And most importantly, the defendants conducted the business of SSI, 2SI, 3SI, and SFIT as one entity. Because of their conduct, the government refers to them as owners or defendant-owners.

sending fake invoices to SSI so Semenchuk could get paid via GEO, deciding whose wives would be included in payroll, and making sure Semenchuk had a "slush" credit card.[2] (Exhibit B).

On March 11, 2011, B. Bartlett sent an email to the defendant-owners containing two versions of SSI's ownership and its related companies. The first version divided ownership of 2SI, 3SI, and SSI in a way that fraudulently supported higher reimbursement claims to MDOT and supported SSI's DBE efforts. The second—and accurate version—confirmed the defendant-owners' intent that they owned the entities equally. The truthful version controlled how they managed SSI and what compensation Semenchuk and his co-defendants received.

A good example of how GEO and the other SSI entities were dependent on each other, and how involved the defendant-owners were in business and financial decisions can be found in a March 25, 2011, email conversation between the defendant-owners about how SSI could support GEO. (Exhibit C). J. Bartlett rans an equipment purchase past

---

[2] A "slush" credit card was an SSI company credit card each defendant-owner was issued. They were allowed to use the card for personal expenses that were charged to and paid by SSI. The use of these cards was considered at the end of the year for equalization purposes but was not declared as income by the defendant-owners.

the defendant-owners and Semenchuk responded that GEO had a pile of expenses and needed cash. B. Bartlett suggested that Tony Thelen loan GEO $20,000 from 2SI. J. Bartlett suggested that GEO send SSI an invoice for $25,000 for "some type of consulting" and Thelen agrees. Office manager and bookkeeper C.S. then created and sent a GEO invoice to SSI for $25,000 for, among other things, "consulting services," paid the fraudulent GEO invoice from SSI's account, and deposited the funds into GEO's account. *Id.* This behavior continued throughout the conspiracy, back and forth between all the SSI entities.

Less than two months after signing the 2011 Secret Agreement (Exhibit A), B. Bartlett emailed the other defendant-owners with the suggestion that they all "sit down" and come up with a "better structure to the [SSI Group] org chart" so they could "easi[ly] keep [their] stories straight" when discussing the entities. (ECF No. 113-2, PageID.1138 (sealed)). After J. Bartlett responded, B. Bartlett replied to everyone, highlighting the need to "keep all of [their] *lies* straight so [they] don't look like idiots." *Id.* n.4 (citing ECF No. 113-2, PageID.1142 (emphasis in original or added – whichever it is) (sealed)).

5

Although Semenchuk intended to use GEO to facilitate SSI's access to and use of DBE preferences (Exhibit D), by May 2011 it was evident that the maximum size limits to be eligible for DBE status would increase, possibly to $19 million. This permitted SSI to apply for DBE status in its own name. Ultimately, that happened and by mid-2012 GEO became inactive. By December 2012, after the DBE size-limits increased, Semenchuk led SSI's efforts to obtain DBE status and purported to be its new 51% owner. This false declaration motivated the defendant-owners to enter into a new secret agreement, effective May 10, 2012, reiterating that they were all equal owners of all SSI entities regardless of what they reported publicly. (Exhibit F),

Semenchuk applied for DBE status for SSI on April 19, 2013. His application was replete with false statements including that he was SSI's 51% owner, and that SSI did not share a location, staff, or equipment with any other entity. In the fall of 2013, MDOT was considering SSI's application and began questioning claims that J. Bartlett and Semenchuk made about SSI's ownership. MDOT scheduled an in-person interview where Semenchuk and J. Bartlett would each have to fill out and certify a questionnaire. Semenchuk and J. Bartlett

knew they had to convince MDOT that Semenchuk was not just a qualifying minority, but the majority owner of SSI. In preparation for those interviews, Semenchuk obtained a blank copy of the questionnaire. Both he and J. Bartlett reviewed it to make sure they would be giving the same answers.

On October 14, 2013, MDOT authorities met with J. Bartlett and Semenchuk. They purported to be 48 % and 51% owners of SSI, respectively. J. Bartlett and Semenchuk were placed in separate locations and were monitored to ensure they did not discuss their answers. Semenchuk made the following false statements in his completed questionnaire, among others:

- That J. Bartlett was a 48% owner of SSI.

- That he was a 51% owner of SSI.

- That he made more money than J. Bartlett.

- That neither he nor other members of SSI had an ownership interest in any other firm.

- That SSI did not share resources.

- That he managed SSI's day to day operations.

- That he handled SSI's finances.

Semenchuk signed this questionnaire and certified that his answers were true. They were not. (Exhibit G).

By November 2013, Semenchuk was frustrated with how long MDOT was taking to process his application and began circulating a draft letter to the defendant-owners seeking concurrence in its tone and substance. (Exhibit H). Semenchuk complained about questions concerning what MDOT called an "unusual interrelationship bond" between SSI and 2SI/3SI. He admitted B. Bartlett and Thelen were SSI employees but falsely stated that they were "not key employees and have no control over SSI, its independence, its finances, or its prequalification status." *Id.* The letter is lengthy, aggressive, and full of false and misleading statements. Semenchuk ends the letter with "SSI's viability and existence does not rely on any other firm but itself. I can replace all my vendors tomorrow including [2si] and [3si] and continue to function independently." *Id.* On December 19, 2013, MDOT denied SSI's application for DBE status. On January 21, 2014, Semenchuk appealed to the United States Department of Transportation (USDOT). (Exhibit I).

The tone of Semenchuk's appeal letter was similarly aggressive. And it contains too many false statements to list here. He doubled down on claims that he was a 51% owner of SSI, that SSI had no control over 2SI or 3SI, and that Thelen and B. Bartlett had no control over SSI finances. "[Thelen and B. Bartlett] are employees of SSI who happen to be involved with companies SSI lease from." *Id*. at 29. Semenchuk claimed that he had control over "ALL" aspects of SSI, *Id*. at 33, and that Thelen and B. Bartlett had no ownership role in SSI and were "employees of SSI and nothing more." *Id*. at 34. Thelen acknowledges this was not true. This appeal letter was vetted and approved by all defendant-owners. On July 25, 2015, based on the false and fraudulent statements made by Semenchuk—and approved by his co-defendants—USDOT overruled MDOT and granted SSI DBE status.

USDOT's reversal coincides closely with the completion of Semenchuk and Ball's buy-in obligations for SSI ownership, allowing them to share fully in the equalization process at the end of every year. And this apparently emboldened Semenchuk to invent a new scheme to defraud MDOT. On December 31, 2014, Semenchuk sent the defendant-owners an email entitled "SSI IT Company," suggesting "forming an IT

9

company for [overhead] reasons" and proposing that "all of [SSI's actual IT provider's] bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." (Exhibit J). The defendant-owners agreed, and Southfield IT a/k/a/ NEC (SFIT) was created. Semenchuk directed an employee of SSI's actual IT provider to reissue invoices to SFIT and assured him they would be paid, as always, by SSI. And from then until July 2019, SFIT was used to overbill MDOT by $1,928,373.12.

By the end of 2015, SFIT joined the "SSI Group" in the equalization process. And if there was any doubt that SSI and its related entities were one company, it can be put to rest after reading the December 30, 2015, memorandum sent to Semenchuk by SSI's accountant. (Exhibit K). The memorandum contains a list of actions SSI had to take before the end of the year to support equalization efforts. The list includes moving money between the entities and to the defendant-owners, issuing fraudulent loans, all to ensure that by the end of the year each of their "cash after tax" will be close to equal. *Id.* [3]

---

[3] A persistent theme posed by the defendant-owners of SSI is that Semenchuk was the actual and legal owner of SSI. Circumstantial evidence, and the defendant's statements during the conspiracy belie

As time went on, Semenchuk and his co-defendants successfully and fraudulently obtained DBE status for SSI, continued to bill MDOT for payroll and IT services SSI did not incur, and inflated reimbursement from MDOT by hiding the true relationship between 2SI, 3SI, and SSI. At the end of every year, a thorough report was generated which equalized all the profits, losses, and obligations of SSI and all its entities and split the net profits equally between the defendant-owners. And every year SSI filed a prequalification package with MDOT containing false information to calculate an inflated overhead rate for reimbursement.

Every year until Semenchuk left SSI at the end of 2018, he submitted and certified the accuracy of the prequalification packages, the DBE applications, and DBE no-change affidavits. He was the public face of SSI. And he was one of the prime movers in accomplishing the fraud perpetrated here. The fiction of Semenchuk's majority ownership

---

this. But most telling are their conversations and efforts in 2018 when Semenchuk and Ball were negotiating the buy-out of their ownership in SSI. Extraordinary efforts were made to acknowledge their equal ownership and to negotiate buy-out terms consistent with that. There is no evidence that Semenchuk sought or was entitled to 51% of SSI assets. (Exhibit L).

of SSI was a critical element of the conspiracy and scheme to defraud. He embraced this role and without him it would have been impossible.

Semenchuk and his co-defendants may claim to be as equal in their culpability as they were as partners in and owners of SSI. But such a claim would be as false as the representations Semenchuk made to MDOT. Through Semenchuk's efforts the company grew in size and reputation, and his false statements continued and expanded along with it. For these reasons he and J. Bartlett are the most culpable members of the conspiracy.

## III.   Sentencing Guideline Calculations

### A.   Base Level - 6:  USSG 2B1.1(a)(1)

Semenchuk pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The maximum possible penalty is 5 years imprisonment. This guideline provision sets the base level at 6. (PSR ¶ 49).

### B.   Loss:  USSG 2B1.1(b)(1)(J): +18

The PSR correctly applies an 18-level upward adjustment, pursuant to § 2B1.1(b)(1)(J), because the fraud loss exceeds $3.5 million. (PSR ¶ 48).

In determining the amount of loss, the district court is to determine it by a preponderance of the evidence. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). The court is not required to compute the loss with precision, and it need only make a reasonable estimate of the loss given the available information. *Id.* at 320; USSG § 2B1.1, comment. (n.3(C)).

The parties agree that if the Court accepts the plea agreement, "the guideline range will be predicated on a fraud loss of more than $3,500,000 and less than $9,500,000." (ECF No. 265, PageID.2997).

## C.   Restitution

This court must order restitution, pursuant to 18 U.S.C. § 3663A, for monetary losses suffered by any individual or entity who was a victim of the fraud scheme. Semenchuk agreed to pay restitution in the amount of $914,360.00 to the victim, Michigan Department of Transportation, representing one-fifth of $4,571,800.00, which is the Government's calculation of total unpaid restitution." (ECF No. 265, PageID.3000).

13

D.    **Sophisticated Means - U.S.S.G. § 2B1.1(b)(10)(C): +2**

The Probation Department and the government agree that a two-level increase in Semenchuk's offense level should be assessed under U.S.S.G. §2B1.1(b)(10)(C). (PSR ¶ 49). This enhancement is appropriate and supported by the facts and the evidence. The commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1, comment. (n. 9(B)).

A series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is "especially complex" or "especially intricate." *United States v. Tandon,* 111 F.3d 482, 491 (6th Cir. 1997); *United States v. Pierce*, 17 F.3d 146, 150-51 (6th Cir. 1994).

In *United States v. Cox,* 357 F. Appx. 629 (6th Cir. 2009), the court observed that while the defendant was not "especially sophisticated," the sophisticated means enhancement applied because the defendant set up a "'pretty clever and sophisticated method of setting up these [accounts] so it would appear that money was being transferred to charities.'" *Id.* Here, Semenchuk is both a "sophisticated" defendant who used a "clever and sophisticated" means to accomplish his fraud.

14

In the *United States v. Erwin*, 67 F. Appx. 876 (6th Cir. 2003), the defendant-stockbroker embezzled approximately $2.3 million from twelve client accounts over a five-year period. *Id.* at 878. The Court upheld the application of the sophisticated means enhancement in large part because the defendant ". . .had to constantly monitor those account statements and perform sophisticated calculations in order to render falsified accounts to his clients and customers. . ." *Id.* at 881. That precise observations apply to Semenchuk's conduct.

Semenchuk's scheme was, by any measure, sophisticated, complex, and intricate. It included the following:

- In 2011, Semenchuk joined a conspiracy that was already defrauding MDOT by including non-employee wives in payroll reimbursement claims and making false claims supporting DBE status. Semenchuk joined it and embraced it. With Semenchuk's help the conspiracy grew in size and intricacy over the next 8 years.

- Semenchuk had to keep track of false billings, inflated payroll, fake lease agreements, and contracts on an almost daily basis. Bank account balances had to be monitored and supported constantly.

- J. Bartlett and Semenchuk held themselves out as the owners of SSI and were the go-to individuals when questions came up.

- Semenchuk aggressively took the lead in applying for DBE status and appealing the denial. His arguments were demonstrably false.

- Every year after SSI received DBE status Semenchuk certified that all his previous, and false, claims were true.

- Every year from 2013-2018, Semenchuk took the lead in creating new ways to inflate billings to MDOT. (Exhibit J).

- J. Bartlett and Semenchuk coordinated false answers they gave to MDOT in 2013 during the DBE investigation of SSI.

- As the conspiracy grew in size and complexity over the years, Semenchuk embraced new streams of illegally-obtained income from MDOT and worked to maximize them.

- The conspiracy Semenchuk helped to manage was multi-pronged and required constant vigilance by him to assure its success.

Considering the elaborate nature of the conspiracy and scheme, Semenchuk's unique ability to conceal its true nature, and the scheme's resulting success and longevity, this offense involved sophisticated means.

## IV.  Application of 18 U.S.C. § 3553

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  In order to determine the "particular"

16

sentence to impose, this Court must consider the familiar statutory factors listed in §3553(a)(1)–(7).

The probation department calculates Semenchuk's guidelines at 37–41 months. If the Court accepts the plea agreement, Semenchuk's sentence would be capped at 21 months. After consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the most appropriate sentence for Semenchuk is 21 months.

### A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Semenchuk's offense was complex, highly orchestrated, and devastating to the trust that the State of Michigan, USDOT, and MDOT gives self-reporting companies to whom they award contracts. Semenchuk engaged in an extensive, well-planned scheme to defraud over the course of 8 years that, just in 2012–2018, involved over-payments by MDOT to SSI of more than $12 million. The conspiracy required Semenchuk's daily attention and effort to keep it from being discovered. His scheme demonstrated disrespect for the law and for the basic moral and ethical behavior expected. And it was well within his power to cease his criminal activity at any point. But the money was just too good.

17

### B.  <u>The History and Characteristics of the Defendant</u>

Given his background, family support, employment history, education, and extensive connections to the community, Semenchuk had every opportunity to succeed and thrive in the legitimate career he chose. Unlike many criminal defendants who resort to crime out of financial desperation, Semenchuk did not devise his scheme in the face of economic privation. Instead, he purposely and intentionally orchestrated a multi-pronged scheme that was both extensive and complex. But at its core, it was a quintessential example of "lying to get money" driven purely by greed.

The Court will no doubt hear Semenchuk and his co-defendants offer excuses, chief among those, "But we did the work and did it better than anyone else." There was nothing more important to the success of the conspiracy and scheme than the fact that SSI did the work and did it well. It tricked MDOT into awarding contracts based on lies and likely contributed to MDOT giving SSI the benefit of the doubt once questions arose.

Semenchuk understood that SSI was taking advantage of MDOT's good opinion of them. Semenchuk was a long-time and respected

employee of MDOT and contributed valuable insider information and expertise to the conspiracy and scheme to defraud. This helped Semenchuk maximize ways to mislead MDOT and to successfully trick them into paying SSI more than it was entitled to. Rather than feeling any shame or contrition for his actions at the time, he treated it as a green light to continue the scheme and to find even new ways to increase illegally gained profits from MDOT as the years passed.

    C.    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

A sentence of 21 months would reflect the seriousness of the offense, promote respect for the law, and adequately punish Semenchuk for his criminal behavior. Semenchuk pleaded guilty to engaging in an eight-year conspiracy to defraud the United States that caused significant financial harm to MDOT. Such repeated, serious criminal behavior calls for a prison sentence to punish him and promote respect for the law. A sentence of 21 months is adequate to achieve those objectives.

**D.   The Need to Afford Adequate Deterrence to Criminal Conduct and To Protect the Public From Further Crimes of the Defendant**

A sentence of 21 months is necessary to deter others as well as to protect the public from further criminal activity by Semenchuk.

The justice system must send a clear message to those inclined to engage in widespread fraud—especially involving highway construction contracts—that such conduct will result in a prison sentence. A sentence of 21 months will achieve this objective, especially in light of Semenchuk's level of culpability when compared to his co-defendants. A sentence below the maximum 21 months that the Court is empowered to impose under the plea agreement will lessen the deterrent effect on others who might face the same temptation as Semenchuk.

**E.   The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

There is no need in this case to adjust the sentence below the guideline range in order to provide Semenchuk with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D).  The prison system can accommodate all of Semenchuk's medical conditions and it is unlikely that he needs to seek further educational opportunities.

**F.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who have been Found Guilty of Similar Conduct**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the guidelines, coupled with careful consideration of the § 3553(a) factors relevant to a specific defendant, is the only available means of preventing the disfavored result of basing sentences on the luck-of-the-draw in judicial assignments. Accordingly, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders.  *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Here, the parties have agreed to cap Semenchuk's sentence at 21 months if the Court accepts the plea agreement. Such a sentence is lower than the guidelines calculated by the probation department but would not be unduly disparate.

V.      **Conclusion**

Based on the extent of Semenchuk's conduct and the significant role he played in the conspiracy, the government urges this Court to impose a sentence of 21 months in prison.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney


 s/ Karen L. Reynolds
Karen L. Reynolds
William J. Vailliencourt, Jr.
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov
william.vailliencourt@usdoj.gov


Dated:  November 7, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on  November 7, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

s/ Karen L. Reynolds
Karen L. Reynolds  (P31029)
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov

24